AO 106 (Rev. 04/010) Application for Search Warrant          AUTHORIZED AND APPROVED/DATE:  s/Arvo Q. Mikkanen 01/27/2026

# UNITED STATES DISTRICT COURT
### for the

| WESTERN | DISTRICT OF | OKLAHOMA |

In the Matter of the Search of                     )
*(Briefly describe the property to be search*        )
*Or identify the person by name and address)*        )
PROPERTY KNOWN AS:                                   )          Case No:  MJ-26- 46-ALM
a copper-colored Apple iPhone cellular               )
device at the Bureau of Indian Affairs               )
Law Enforcement Office, Evidence Storage             )
Facility, Anadarko, Oklahoma 73005,                  )
within the Western District of Oklahoma              )

FILED
JAN 28 2026
JOAN KANE, CLERK
U.S. DIST. COURT
BY _____ DEPUTY, WESTERN DIST.

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 113(a)(3) & 1153 | Assault with a Dangerous Weapon |
| 18 U.S.C. §§ 113(a)(6) & 1153 | Assault Resulting in Serious Bodily Injury |
| 18 U.S.C. §§ 1112 &1153 | Voluntary Manslaughter |

The application is based on these facts:

See attached Affidavit of Special Agent Britnay Kilmer, Bureau of Indian Affairs, which is incorporated by reference herein.
- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____ #390
*Applicant's signature*

Brittany Kilmer
Special Agent
Bureau of Indian Affairs

Sworn to before me and signed in my presence.

Date: _____1/28/24_____

City and State:  Oklahoma City, Oklahoma

_Amanda L. Maxfield_
*Judge's signature*

Amanda L. Maxfield, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH OF
A COPPER COLORED APPLE iPHONE
CELLULAR PHONE DEVICE WHICH IS
LOCATED AT THE BUREAU OF INDIAN
AFFAIRS LAW ENFORCEMENT OFFICE,
EVIDENCE STORAGE FACILITY,
ANADARKO, OKLAHOMA 73005,
WITHIN THE WESTERN DISTRICT
OF OKLAHOMA

## AFFIDAVIT IN SUPPORT OF CELL PHONE SEARCH WARRANT

I, Brittany Kilmer, am a Special Agent with the Bureau of Indian Affairs (BIA), Branch of Criminal Investigation (BCI), U.S. Department of Interior. As your affiant, being first duly sworn, I hereby depose, and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application for a warrant under Federal Rule of Criminal Procedure 41, to examine and forensically examine a copper colored Apple I Phone which is located stored at the Bureau of Indian Affairs Law Enforcement Office, Evidence Storage Facility, Anadarko, OK 73005, in Caddo County, within the Western District of Oklahoma. The property to be searched is described further in Attachment A, and the property to be seized is described in Attachment B.

2.      I make this Affidavit in support of an Application for a Search Warrant because probable cause exists to believe that on or about Thursday, November 6, 2025, north of Anadarko, Caddo County, Oklahoma, within Indian country jointly owned by the

1

Wichita, Caddo, and Delaware Tribes, which is held in trust status by the United States government, within the Western District of Oklahoma, Charles Allen Rednose ("Charles"), assaulted Holly Ann Rednose ("Holly") and Kathryne Louise Silverhorn ("Kathryne"). The assaults on both individuals were carried out using a knife and constituted an Assault with a Dangerous Weapon under 18 U.S.C. § 113 (a)(3). The assaults also resulted in serious bodily injury to each of them and also constituted an Assault Resulting in Serious Bodily Injury under 18 U.S.C. § 113 (a)(6). Finally, the unlawful assault on Kathryne caused her death, arising under sudden quarrel and heat of passion, thereby constituting Voluntary Manslaughter under 18 U.S.C. § 1112. The I Phone described, the SUBJECT CELLULAR PHONE, was recovered from the possession of Charles Rednose, when he was apprehended by law enforcement on or about November 6, 2025, shortly after the stabbing incident.

3.    I have been a law enforcement officer for ten years, have worked in the capacity as a Tribal Officer, Police Officer, Deputy Sheriff, and now am serving as a federal Special Agent for the BIA. I attended a training facility of the Oklahoma Council on Law Enforcement Training ("CLEET") for basic police training. I also attended the Federal Law Enforcement Training Center ("FLETC") at the Bridge Indian Police Academy ("IPA") for basic Indian country police officer training. I also attended the FLETC for the Department of the Interior Investigator Training Program ("DOI ITP"). For the past 4 years, I have been employed with the BIA, Office of Justice Services ("OJS"). I am currently a Special Agent assigned to District II in Oklahoma. My primary duties as a Special Agent are to investigate felony criminal offenses, which occur within the Indian

2

country of the tribal jurisdictions of multiple tribal governments in the Western District of Oklahoma, to which I am assigned. During my tenure I have served as the primary investigator for a number of cases and have also served in a backup capacity. I have also received significant training in conducting criminal investigations, including investigations of violent crimes occurring within Indian country from a variety of training programs.

4.      I am categorized as a "federal law enforcement officer" pursuant to Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am also designated as an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am presently serving in that capacity in connection with this matter.

5.      As such, I am authorized by law to conduct investigations of violent crimes in Indian country, including Assault with a Dangerous Weapon, Assault Resulting in Serious Bodily Injury, and Voluntary Manslaughter, under 18 U.S.C. §§ 113 (a)(3), 113 (a)(6), and 1112. Where an Indian, such as Charles Rednose, is involved as a defendant, and the crime is committed within Indian country, as defined by 18 U.S.C. § 1151, as is the case here, federal criminal jurisdiction is triggered under 18 U.S.C. §1153, the Major Crimes Act. I am a case agent in connection with this investigation and was the affiant in a November 17, 2025 affidavit seeking a Criminal Complaint and Arrest Warrant for Charles Rednose, which was issued by the Western District of Oklahoma. The court found that probable cause exists to believe that on or about Thursday, November 6, 2025, north of Anadarko, Caddo County, Oklahoma, within Indian country in the Western District of Oklahoma, he committed a variety of federal criminal offenses, as described. The defendant was subsequently indicted by the federal grand jury for the same offenses

described herein, on or about December 2, 2025.

6.    Based upon my investigation, the Complaint, and the Indictment, there is probable cause to believe that Charles Rednose, assaulted Holly Ann Rednose ("Holly") and Kathryne Louise Silverhorn ("Kathryne"). The assaults on both individuals were carried out using a knife and constituted an Assault with a Dangerous Weapon under 18 U.S.C. § 113 (a)(3). The assaults also resulted in serious bodily injury to each of them and also constituted an Assault Resulting in Serious Bodily Injury under 18 U.S.C. §§ 113 (a)(6). Finally, the unlawful assault on Kathryne caused her death, arising under sudden quarrel and heat of passion, thereby constituting Voluntary Manslaughter under 18 U.S.C. §§ 1112.

7.    The facts and statements in this affidavit are based in part on my own personal observations and investigation; information provided to me by other law enforcement officers and witnesses, either directly or indirectly; and is also based on my experience, training, and background as a Special Agent with the BIA. This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not set forth all the relevant facts known to me and/or other law enforcement officers.

8.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

9.    <u>Forensic evidence</u>. As further described in Attachment B, this application

seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT CELLULAR PHONE device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT CELLULAR PHONE Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend

on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

10.    Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant by the BIA or any other assisting law enforcement agency. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11.    Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

12.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device, like the SUBJECT CELLULAR PHONE Device, used for voice and data communication

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital

7

data, including data unrelated to photographs or videos. An iPhone includes built in digital camera.

c.    <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. An iPhone includes a portable media player.

d.    <u>GPS</u>: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS

antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. An iPhone contains a GPS positioning feature.

e.    <u>PDA</u>: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device. An iPhone may contain an application that includes features of a PDA.

f.    <u>Financial Transactions:</u>  An iPhone may contain or utilize features such as Apple Pay, CashApp, Venmo or other similar programs or platforms that assist in performing financial transactions.

9

g.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or smart phone device, including an iPhone, attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

h.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.    Based on my training, experience, and open source research, I know that the SUBJECT CELL PHONE device taken from Charles Rednose, currently in the custody and control of the Bureau of Indian Affairs, has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, among other things. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as stored data, images, files, links, recordings, and

other information relevant to the investigation of this defendant regarding the distribution, manufacturing, and possession of controlled dangerous substances.

## BIOMETRIC ACCESS TO THE DEVICE

14.　I also request that this warrant permit law enforcement to compel Charles Rednose to unlock, via non-testimonial biometric means, the SUBJECT CELLULAR PHONE Device, including requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

15.　I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

16.　If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

11

17.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. With this feature, during the set up and/or registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

18.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. During the registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises.

19.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

20.    As discussed in this Affidavit, I have reason to believe that evidence regarding the defendant's criminal activity will be found during a search of the SUBJECT CELLULAR PHONE Device. The passcode or password, if enabled, that would unlock

the electronic devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the electronic devices, making the use of biometric features necessary to the execution of the search authorized by this warrant, if software utilized to recover such information is blocked or ineffective at its retrieval due to such features.

21.    In the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may be the only means of recovering the stored information.

22.    Due to the foregoing, if the SUBJECT CELLULAR PHONE Device may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Charles Rednose to the fingerprint scanner of the Device; (2) hold the Device in front of the face of Charles Rednose and activate the facial recognition feature; and/or (3) hold the Device in front of the face of Charles Rednose and activate the iris recognition feature, for the purpose of attempting to unlock the SUBJECT CELLULAR PHONE Device in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to require that Charles Rednose, or any other person, provide a testimonial statement, verbalize, explain, state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to require Charles Rednose to provide testimony to identify which, if any, of the specific biometric characteristics (including the unique finger(s) or other physical features) that may be necessary to unlock or access the device.

13

## STATEMENT OF PROBABLE CAUSE

23.    On the evening of Thursday, November 6, 2025, a number of individuals were at the Budget Inn, a motel located in the City of Anadarko, Oklahoma in Caddo County. The defendant Charles Rednose, and his aunt, Holly Rednose, each had separate rooms at that motel. On November 6, 2025, Charles Rednose posted a video to Facebook, a social media service platform, under the name "Hunnidseven Trapp" wherein he was drinking what appears to be tequila from a bottle and was dressed in a red and black "Chicago Bulls" basketball jersey, as shown below:



I know from my training and experience that often times videos such as the one shown above, posted on November 6, 2025 can be recorded to and uploaded from cellular telephone devices.

Charles and Holly Rednose, along with three other individuals, Kathryne Silverhorn, Tara Sampson ("Tara"), and Gayle Adair ("Gayle") were socializing and

14

drinking alcohol at the motel. Holly reported that the defendant Charles Rednose, wanted to go to the casino. The group decided to travel to the Gold River Casino off of Highway 281, north of Anadarko, in Kathryne Silverhorn's white 2015 Nissan Sentra. As Charles Rednose arrived at the casino he is seen on a cellular phone device. See below:





Once there, they went into the casino, and Charles began gambling and playing gaming machines. On multiple occasions on the casino security video footage Charles Rednose can be observed to be texting or messaging on a cellular smart phone as he is walking around in the casino. The illuminated screen of the cellular phone can be seen on the video surveillance recordings on multiple occasions, as seen below:









Charles Rednose can also be seen at the ATM machine while he was in the casino, as shown below:



It is believed that this is the same device that is seen in these multiple screenshots of the casino surveillance video footage is the SUBJECT CELLULAR PHONE device sought for examination by this search warrant.

Sometime after they had been at the casino, the group decided to go pick up another individual, Dakota Archilta ("Dakota"), who had been working at McDonald's and was set to get off work at 10:00 p.m. The McDonald's is located on the south side of Anadarko. Charles was still playing gaming machines and Charles's aunt, Holly Rednose, advised him that the group was considering leaving but would return to the casino after they had

picked up Dakota from McDonalds.

The group left the casino in the white Nissan Sentra, leaving Charles Rednose behind. Charles Rednose is seen leaving the casino with the cellular phone in his hand.



According to Charles, he didn't realize the group had actually left until he couldn't find them and observed that the White Nissan Sentra was missing from the parking lot. Charles is captured on the casino surveillance video leaving and walking away from the casino on or about 10:44 p.m.

24.     Tara Sampson was the designated driver who was not drinking alcohol, as the group (minus Charles Rednose), went to pick up Dakota at the McDonalds. After they

picked him up, they went back to the motel room to drink more alcohol. They then left the motel and proceeded back to the casino to pick up Charles. After they arrived back at the casino, several individuals looked around inside the casino but could not find Charles. Eventually those individuals, realizing that he was no longer there, got back into the white Nissan Sentra and traveled south with the group on U.S. Highway 281 towards Anadarko.

25.     Between the casino and the north edge of the city limits of Anadarko, the group observed Charles Rednose walking south on Highway 281, and Tara pulled over to pick him up. Once they stopped, Charles' aunt Holly got out of the vehicle because Charles would not get into the vehicle because he was mad that the group had left him at the casino earlier. Holly indicated that she was trying to convince him to get into the vehicle so they could take him back into town. Holly stated that Charles was so upset that he was crying because they had "left him behind." Holly got back into the vehicle and told the group that Charles didn't want a ride from them. Tara said that Charles was very upset and said that he would "kill" Holly. Tara said that Holly said she didn't want to just leave him there because he was her nephew. Holly advised that Kathryne also said they couldn't just leave him on the side of the road.  Holly got back out of the car to try and persuade him to get into the vehicle. Ultimately, the argument became physical, and Holly and Charles began fighting with one another. Kathryne then got out of the vehicle and was attempting to intervene between Holly and Charles. Tara said Kathryne was trying to "stop" the fighting between the other two.

26.     In the midst of the struggle, Holly indicated that Charles began physically hitting her and thereafter she realized that it wasn't just his fists that he was hitting her

with, but she saw her own blood and at that point she realized that had been stabbed. She shouted out that she had been stabbed and retreated back to the vehicle and got in. Kathryne also retreated back to the vehicle and got in. Holly later confirmed that she did not have a knife and that it was not her knife that Charles was using to stab her and Kathryne. Once inside the vehicle Holly advised Tara she had been stabbed and Tara, seeing her blood drove at a high rate of speed south into Anadarko to get medical help at the Anadarko Hospital on the east side of the city. Dakota also saw that Kathryne was bleeding. Tara saw that Kathryne was slumped over and unresponsive. Holly did not understand why Charles was so upset other than the fact that they left him at the casino to go pick up Dakota and was at a loss as to why the stabbing took place because everything has been "chill" up to that point and was enjoyable for everyone concerned. The group had gotten together for the evening to celebrate Gayle's birthday.

27.     An Anadarko Police unit, occupied by Officer Alfredo Moreno, observed the white Nissan Sentra traveling through Anadarko at a high rate of speed and proceeded to follow it because it was traveling over the speed limit. Officer Moreno followed the vehicle all the way to the Anadarko Hospital. Once there, Holly got out of the vehicle bleeding profusely as well as Kathryne who was seated in the vehicle who was apparently slumped over and was also bleeding. Officer Moreno observed Kathryne loaded into a wheelchair and brought into the hospital. Both victims were admitted for treatment of their stab wounds. Kathryne was so seriously injured she was unconscious and non-responsive, bleeding from multiple stab wounds, as medical personnel tried desperately to stabilize her condition. Officer Moreno observed that Holly was in obvious pain from her stab wounds.

His bodycam video captured Holly in a hospital room bleeding from multiple stab wounds, moaning and crying out in pain saying "it hurts" over and over again. Such stab injuries would constitute serious bodily injury because the victims were experiencing extreme physical pain, under 18 U.S.C. §§ 1365(h)(3)(b).

28.    While they were in the white Nissan Sentra traveling from the location of the incident to the Anadarko Hospital, the two victims were bleeding heavily from their wounds. The vehicle was secured and towed to the BIA Concho Agency Storage, El Reno, OK 73036, Canadian County, within the Western District of Oklahoma, where it presently remains. The vehicle, belonging to Kathryne Silverhorn, was locked and secured behind a locked fence.

29.    Officer Moreno was advised by Tara, shortly after they arrived at the hospital, that it was Charles Rednose who had stabbed the two victims. That information was communicated to dispatch for other law enforcement to look for him. Having received this information by radio, a second Anadarko police unit driven by Officer Travis Maloy, was driving north out of Anadarko along Highway 281 in an attempt to locate Charles Rednose. Officer Moreno also got a description of the suspect, being advised that he was wearing a "beanie" type hat. Officer Maloy was on the phone with Officer Moreno when he was relayed this information and observed an individual matching the description provided by Tara, walking on Highway 281 near the city limits and stopped and detained him. The individual stopped was indeed Charles Rednose, who identified himself. At the time of his arrest the SUBJECT CELLULAR PHONE device was removed from the pocket of Charles Rednose. This was captured on Officer Maloy's bodycam video. A screenshot

of the bodycam video is shown below:



30.    Charles Rednose was taken into custody by Officer Maloy.

31.    A third law enforcement unit, occupied by Caddo County Sheriff's Deputy Kylie Craig, travelled to the location and met officer Maloy and physically took control of Charles Rednose, placed handcuffs on him, and put him in the back of her vehicle. Deputy Craig took possession of the property that was in Charles Rednose's pockets, including the SUBJECT CELLULAR PHONE, as shown below from Officer Maloy's body cam:



32.    Charles Rednose began spontaneously talking and providing information about what happened. He told Deputy Craig that he had been at the casino but that those who had accompanied him there had "left him." Rednose described the approximate location where the altercation took place on the side of Highway 281 north of Anadarko and she drove her unit north with him in the back seat of the unit, in an attempt to determine the exact spot where the incident occurred.

33.     Rednose recounted to Deputy Craig that his aunt, Holly Rednose, and a group of other individuals tried to beat him up and pulled a knife out on him. He said he was involved in an altercation, not with 2 individuals, but instead with 4 or maybe 5 individuals on the side of the highway, which did not match the account provided by the witnesses at the Anadarko Hospital. He further stated that the individuals were beating him and pulled his shirt over his head as they tried to "jump him." He said that it was Holly that pulled a knife on him. When interviewed later he stated that he got the knife away from Holly and stabbed her. He said he dropped the knife and no longer had it in his possession.

34.     After moving her vehicle, Deputy Craig was unable to determine or see any blood at that time on the road or the shoulder of the highway that might have indicated exactly where the incident took place. Deputy Craig said at that time it was dark and difficult to see. Deputy Craig was advised by Rednose that he had a cut on his pinky finger and after she asked him if he needed it to be treated, and he responded in the affirmative. She called for an ambulance to respond to the scene. Anadarko EMS responded to the scene at the request of Deputy Craig and Rednose was examined and provided a Band-Aid for a minor cut on his pinky finger. Realizing the account of the incident given by Rednose did not match the information provided by the witnesses at the hospital, Deputy Craig kept him in her vehicle.

35.     The location where the assault took place appeared to be north of the northern edge of Anadarko which is on tribal land of the Wichita, Caddo, and Delaware Tribes ("WCD Tribes"), federal officers of the Bureau of Indian Affairs ("BIA") were contacted to proceed to the location. Deputy Craig kept Rednose in her unit until officers of the BIA

were able to arrive and take over the case.

36.     At approximately 23:25 hours, patrol officer Lieutenant Glen Gutierrez of the Anadarko Agency of the BIA, was dispatched to respond to Highway 281 near Riverside Drive just north of the Anadarko city limits. When Lt. Gutierrez arrived, he met with Deputy Sheriff Kylie Craig who had been waiting for him with Rednose in her vehicle. She advised Lt. Gutierrez that she had the suspect from the stabbing incident in her patrol vehicle, and Gutierrez took possession of him because he was an Indian and the location where the incident occurred is known to be Indian country trust land. Rednose was confirmed by official tribal records to be a citizen of the Apache Tribe of Oklahoma ("Apache Tribe"), a federally recognized Indian tribe, and possesses a Certificate of Degree of Indian Blood (CDIB) that indicates that he has a degree of Apache Indian blood, and is therefore an American Indian under federal law. Lieutenant Gutierrez also took possession of the SUBJECT CELLULAR PHONE DEVICE.

37.     The two stabbing victims, Holly and Kathryne were at the Anadarko Hospital in serious condition and requests were made to medi-flight the victims to Oklahoma City, some 60 miles away, where they could receive medical treatment for their stabbing injuries. The Anadarko Hospital was not equipped to handle such a serious medical emergency. Kathryne had at least 4 stab wounds, including one in her chest right below her sternum, in her back, and at least two to her abdomen, and subsequently "coded," or in other words she lost her heartbeat and respiration, on multiple occasions and was revived by medical personnel at the Anadarko Hospital. However, Kathryne's injuries were so severe that she did not survive, and she was pronounced dead at the Anadarko Hospital before she could

be transported to Oklahoma City. The wounds inflicted upon her were not long "slicing" injuries but rather appeared to be direct stabbing punctures. Such injuries to Kathryne would constitute serious bodily injury, as they created a substantial risk of death under 18 U.S.C. §§ 1365(h)(3)(A), evidenced by her passing away.

38.     Moreover, both victims of the crime, including Kathryne Silverhorn (deceased) and Holly Rednose, are tribal citizens and Indians within the meaning of federal law, being enrolled members of the Kiowa Tribe and the Apache Tribe, respectively. Each of these individuals also possesses Indian blood of these tribes that have been recognized by the United States of America. As such, the federal government and this court would still have jurisdiction over the crimes alleged, under 18 U.S.C. § 1152, even if the offender was not an Indian.

39.     Holly remained alive for long enough to get approved for transfer to OU Medical Center and was transported via "Survival Flight" helicopter to the University of Oklahoma Medical Center ("OU Medical Center") in Oklahoma City where surgery was performed as a result of the injuries she sustained from multiple stab wounds. It would also be evident that injuries sustained by Holly would constitute serious bodily injury as substantial risk of death under 18 U.S.C. §§ 1365(h)(3)(A), because she had to receive life saving medical procedures and emergency, not elective, surgery at the OU Medical Center in Oklahoma City as a result of Charles stabbing her.

40.     Lt. Gutierrez, who had Rednose in his custody, transported him to the Grady County Jail, where he was booked in on tribal charges of assault and recklessly endangering another for prosecution in the Court of Indian Offenses for the Wichita, Caddo, & Delaware

Tribes at the Anadarko Agency of the BIA. Probable cause was found for the charges and he was detained with "no bond."

41.    On November 7, 2025, BIA Special Agent Henry Kaulaity and BIA Patrol Officer Lt. Gutierrez travelled back out to the location where the assault was believed to have taken place and they were able to locate the scene where the assault occurred. They observed that there was a significant amount of blood on the highway. A red Chicago Bulls basketball jersey and parts of a broken necklace that Charles Rednose had previously wore that evening before were located and photographed, further confirming the location of the incident.

42.    The GPS or geopositioning satellite location of the blood spot was provided to the realty office of the BIA, which was confirmed to be within the Indian country of the Wichita, Caddo, and Delaware Tribes. A formal written opinion confirming that the land where the incident took place was held in trust status was completed on November 10, 2025. Since the realty office of the BIA confirmed that this location is jointly owned by the Wichita, Caddo, and Delaware Tribes, which is held in trust status by the United States government, and they are each federally recognized Indian tribes, the location where the assault occurred qualifies as Indian country under 18 U.S.C. § 1151.

43.    On November 8, 2025, BIA Special Agent Kaulaity and BIA Special Agent Brittany Kilmer interviewed Charles Rednose about the incident. Rednose was read his Miranda Rights, and he agreed to speak with law enforcement. Rednose described going with the group to the Gold River Casino. He became upset when he realized the group had left and that he was alone with no more money and a dead cell phone, so he started walking

back from the casino towards Anadarko. During the interview Charles stated that the group pulled up and offered him a ride back to Anadarko. He said at that point all five individuals "jumped him" and there a physical fight ensued. He said his aunt Holly Rednose had a knife that she had pulled out and he took it away from her and began swinging at her and the individuals that he said were assaulting him. Charles confirmed that he stabbed Holly and Kathryne multiple times. Charles said his aunt Holly said at the time to him, "you stabbed me." Rednose said he began walking away. Charles said after he stabbed his aunt "they" (Holly, Kathryne, and others) got in the vehicle and drove away quickly. Charles said he dropped the knife and no longer had it in his possession when law enforcement arrived on the night of the incident. He said he also lost a chain, earrings, and a red Chicago Bulls jersey during the incident. From the described facts, he wielded the knife and intended to cause serious bodily injury and/or acted recklessly with extreme disregard for human life, when he unlawfully stabbed Kathryne multiple times.

44.    On November 10, 2025, Special Agent Kaulaity interviewed Holly Rednose at OU Medical Center, where she remained admitted following her treatment and surgery. Holly said that on the evening in question they had been drinking at a motel in Anadarko and that Charles wanted to go to the casino. She, along with Kathryne, Tara, and Gayle went to the Gold River Casino where Charles began playing the gambling machines. She stated that another friend, Dakota Archilta was working at the Anadarko McDonald's and they were going to pick him up after he got off of work at 10:00 p.m. Holly said she knew that Charles was still gambling and told him that they were going to leave to get Dakota and would return back to the casino to pick him up afterwards.

45.    She said that when they returned to the casino with Dakota, they could not find him and concluded that Charles was no longer there, so they decided to drive back to Anadarko. Holly stated that she and the group saw Charles walking towards Anadarko on the highway, and they stopped to give him a ride back into town. She said that Charles refused to get into the vehicle. Kathryne said that they couldn't just leave him there on the side of the road, so she urged Holly to persuade him to get in. Holly said she got out of the vehicle because Charles refused to get in, explaining he was mad and upset at her because they left him at the casino to retrieve Dakota. Holly stated that Charles was so upset he was crying because he was left alone at the casino. Holly physically pulled on Charles to persuade him to get into the vehicle. Holly said they then became physical and he started to strike her. Katheryne got out of the vehicle to try and break up the fight. Holly believed Charles was just hitting her. However, when Holly stepped away, she realized she was stabbed after she saw blood and the cut on her arm, yelling at him "you stabbed me."

46.    Holly and Kathryne got back into the vehicle without Charles, and Tara drove them to the Anadarko Hospital. Holly said she was medi-flighted from Anadarko to Oklahoma City, and she woke up in the OU Medical Center. Holly advised that she had eight stab wounds on her left side, two in her abdomen and her arm. Holly stated parts of her colon and her spleen were removed and her lung was repaired because of the stabbing wounds.

47.    Video surveillance received from the casino surveillance system at the Gold River Casino confirms that the named individuals arrived at the casino at approximately 9:40 in the evening and that they ultimately left at approximately 10:00 p.m. The video

also shows Charles Rednose inside the casino at approximately 10:30 p.m. dressed in a red Chicago Bulls jersey, the same jersey as that in the video he posted to Facebook. Video surveillance shows that Charles left the casino at approximately 10:44 p.m. and that the individuals returned to the casino about 11:03 p.m. and left again thereafter.

48.    On November 12, 2025, Special Agent Kaulaity spoke to Tracey Marek, Registered Nurse from OU Medical Center who described Holly Rednose's injuries to him. Holly Rednose had nine stab wounds to left abdomen/flank area and two wounds to her left arm causing a collapsed lung, left rib fracture, and organ damage. Holly underwent surgery when she arrived at OU Medical Center and had parts of her spleen and her intestines removed due to injury of the bowel infrastructure. Such injuries would constitute serious bodily injury as impairment of the function of an organ under 18 U.S.C. §§ 1365(h)(3)(D).

49.    On Wednesday November 12, 2025, during the daytime hours, BIA Law Enforcement along with other law enforcement officers, conducted a search of the area where Charles described that he had dropped the knife he used to stab Holly and Kathryne.

50.    BIA Law Enforcement Lieutenant Glen Gutierrez located the knife used to assault Holly and Kathryne at the southwest end of the Highway 281 Washita River Bridge. The knife had a red colored dried substance that appeared to be blood on it. The knife was photographed, documented and collected for evidence. The knife was found approximately 0.3 miles from where the assault had occurred as shown by the blood spots found on the highway. The knife was located near the vicinity of where Charles was initially detained by law enforcement.  It was found very close and on the same side of the road where

Anadarko Police Officer Maloy's bodycam video shows Charles Rednose was walking when he first pulled up. It is significant to note that the knife was also inscribed with large engraved letters on one side that said "Charles" on it.

51.    Charles Rednose is known to have a Facebook profile and account under the name "Hunnidseven Trapp." Your affiant knows that persons who have a Facebook social media account can message other individuals on their smartphone through a platform known as "Facebook Messager," and it is therefore possible that Rednose may have been utilizing this feature and sending messages to others, as he was observed walking around the Gold River Casino on video surveillance on the subject phone. Cellular phones can also be used to take videos, photographs, and send text messages and/or emails to other individuals, as described above.

## CONCLUSION

52.    Based on the foregoing facts, I believe that on or about Thursday, November 6, 2025, in Caddo County, Oklahoma, within Indian country jointly owned by the Wichita, Caddo, and Delaware Tribes, which is held in trust status by the United States government, within the Western District of Oklahoma, Charles Rednose, knowingly assaulted Holly Rednose and Kathryne Silverhorn, resulting in serious bodily injury to Holly and Kathryne in violation of 18 U.S.C. § 113 (a)(6). His knowing use of a knife to commit the assault on each individual constitutes an assault with a dangerous weapon, which is a violation of 18 U.S.C. §§ 113 (a)(3). Because the assault arose under the circumstances of a sudden quarrel and heat of passion by Charles Rednose, and Kathryne died as a result of her stabbing injuries knowingly and unlawfully committed by him, where he intended to cause serious

bodily injury and/or acted recklessly with extreme disregard for human life, he also committed Voluntary Manslaughter, in violation of 18 U.S.C. §§ 1112. Furthermore, because Charles Rednose is an American Indian, an enrolled member and citizen of the Apache Tribe, a federally recognized tribe, and possesses a degree of Indian blood, and the offense took place within Indian country as defined by 18 U.S.C. § 1151, there is federal jurisdiction for the offenses referenced under the Major Crimes Act, 18 U.S.C. § 1153.

53.    From my training and experience I know that persons utilize their cellular smartphones for communication with other individuals and such messages can contain information which is relevant to their demeanor, intent, and objectives at the time the messages were sent or received. Additionally, photographs, videos, or recordings on such devices can document or provide information about the sequence of acts or events on the dates such files were created. As described above, there is probable cause to believe that evidence of a crime, contraband, fruits of a crime, or other items illegally possessed, property designed for use, intended use, or used in committing the crimes described herein will be found on the SUBJECT CELLULAR PHONE device.

54.    Based upon all of the facts and circumstances described, and given the facts set forth above, I am requesting a search warrant be issued authorizing the search of the copper colored Apple iPhone recovered off of Charles Rednose, which is the property described in Attachment A and further authorizing the seizure of the items described in Attachment B.

BRITTANY KILMER #390
Special Agent, Bureau of Indian Affairs

35

Sworn to me on this 28th day of January, 2026.

AMANDA L. MAXFIELD
United States Magistrate Judge

## ATTACHMENT A

The property to be searched is a COPPER COLORED APPLE IPHONE CELLULAR PHONE DEVICE, pictured below:



37



## ATTACHMENT B

All evidence in the SUBJECT CELLULAR PHONE Device described in Attachment A, which relates to the crimes of Voluntary Manslaughter, Assault Resulting in Serious Bodily Injury, and Assault with a Dangerous Weapon under 18 U.S.C. §§ 1112, 113 (a)(6), and 113 (a)(3), to include but not limited to:

a.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers.

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from the Device and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, Face Time, Skype, and WhatsApp, SMS text, email communications, or other text or written communications sent to or received from any digital device.

d.    Data, records, documents, programs, applications or materials relating to any of the victims or witnesses described in the affidavit.

e.    Audio recordings, pictures, photographs, video recordings or still captured images on the phone memory cards, or other storage related or contained in the Device.

f.    Contents of any calendar or date book stored on the Device.

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

h.    Any Device used to facilitate the above-listed violations (and forensic copies thereof).

i.    Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and

instant messaging logs, photographs, and correspondence.

j.     Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

k.     Evidence of the attachment to or connection with other devices.

l.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device.

m.     Evidence of the times the device was used.

n.     Passwords, encryption keys, and other access devices that may be necessary to access the device.

o.     Applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it.

p.     Records of or information about Internet Protocol addresses used by the device.

q.     Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

r.     Records of any cash transactions, fund transfers, or other financial transactions through features or applications such as Apple Pay, CashApp, Venmo, or other similar services.

1.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2.     During the execution of the search of the SUBJECT CELLULAR PHONE Device (described in Attachment A), law enforcement personnel are also specifically authorized to compel Charles Rednose to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of the SUBJECT CELLULAR PHONE Device for the purpose of attempting to unlock the Device's security features in order to

search the contents as authorized by this warrant.

3.      This warrant does not authorize law enforcement personnel to compel any other individuals to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock the SUBJECT CELLULAR PHONE Device. Further, this warrant does not authorize law enforcement personnel to request that Charles Rednose or any other individuals provide testimony, verbally state or otherwise provide the password or any other means that may be necessary to unlock or access the Device, including by identifying which of the specific possible biometric characteristics, if any, (including the unique finger(s) or other physical features) that may be utilized to unlock or access the Device.

4.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the BIA, or other assisting law enforcement agency, may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.